YELLOW CAB COMPANY OF
PITTSBURGH, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 14, 1995.
Decided March 21, 1996.

Ray F. Middleman, for Petitioner.

Janet M. Sloan, Assistant Counsel, for Respondent.

Before DOYLE and SMITH, JJ., and MIRARCHI, Jr., Senior Judge.

SMITH, Judge.

Yellow Cab Company of Pittsburgh (Yellow Cab) petitions for review of an order of the Pennsylvania Public Utility Commission (Commission) that denied Yellow Cab's exceptions to an initial decision of an administrative law judge (ALJ) and approved the application of UJSP, Inc. (UJSP) to transport persons as a common carrier in call and demand service in the City of Pittsburgh. The questions Yellow Cab presents are whether the Commission erred in (1) finding that UJSP demonstrated a propensity to operate safely and legally; (2) finding that UJSP proved need for the requested service, and in the full geographic area sought; (3) finding that UJSP was technically and financially fit to render the proposed service; (4) excluding testimony and certain evidence presented by Yellow Cab regarding demographics and other matters on the basis of hearsay and of lack of qualification; and (5) failing to require UJSP to republish the ap-

plication after the name was changed from Curtis McCoy to UJSP.

In 1993 Curtis B. McCoy filed an application under the name United Jitney Stations of Pittsburgh, Inc. for the right to perform taxicab service in the City of Pittsburgh. It was refused for lack of corporate information, and McCoy refiled it as an individual. The refiled application was duly published in the Pennsylvania Bulletin. Yellow Cab filed a timely protest. At an initial hearing McCoy presented 12 witnesses on the issue of need for the proposed service. After McCoy finally provided documentary evidence sought by Yellow Cab, the ALJ directed amendment of the application to name the corporation UJSP as applicant without republication. At further hearings UJSP presented more testimony on the issue of need and the testimony of UJSP investors and officers. Yellow Cab presented evidence from its chief executive officer and the general manager of Peoples Cab Company.

■■■ In its order the Commission expressly adopted the initial decision of the ALJ. The Commission noted its statutory duty under Section 1103(a) of the Public Utility Code, 66 Pa.C.S. § 1103(a), to grant certificates of public convenience only if the Commission finds or determines that the grant "is necessary or proper for the service, accommodation, convenience, or safety of the public." The Commission concluded that UJSP had met its burden pursuant to 52 Pa.Code § 41.14, relating to evidentiary criteria used to decide motor common carrier applications, which the PUC has adopted as a

guide in performing its statutory duty.[1] This appeal followed.[2]

## I.

■■■ Yellow Cab first contends that this record shows that UJSP lacks a propensity to operate safely and legally. Yellow Cab notes that the previous version of the application was on behalf of McCoy as an individual and asserts that he is the "driving force" behind the project and that he is "believed to be the majority shareholders [sic] and the primary individual responsible for the creation of the business." Brief of Petitioner, p. 13.

Yellow Cab emphasizes testimony by McCoy on cross-examination that he had performed jitney operation in the past, that he had received a citation and $300 fine for doing so and that he continued to operate a jitney occasionally even during the pendency of the application proceedings. Before the application, McCoy had placed a newspaper advertisement for other drivers to assist him. In addition, Yellow Cab points to evidence of other infractions by McCoy, including his failure to report his income from jitney operations to the Internal Revenue Service for the years 1991 and 1992, his convictions for assault for shooting a person in the arm and stabbing an individual with a pair of scissors, his receipt of a speeding ticket in 1993 and his false statement on his Yellow Cab employment application that he had not been convicted of a crime.

The ALJ acknowledged this evidence and stated that if McCoy were the applicant, the

---

1. The regulation at 52 Pa.Code § 41.14 provides:

    (a) An applicant seeking motor common carrier authority has a burden of demonstrating that approval of the application will serve a useful public purpose, responsive to a public demand or need.

    (b) An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service, and, in addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally.

    (c) The Commission will grant motor common carrier authority commensurate with the demonstrated public need unless it is established that the entry of a new carrier into the

field would endanger or impair the operations of existing common carriers to an extent that, on balance, the granting of authority would be contrary to the public interest.

2. The scope of this Court's review of a decision of the Commission is to determine whether the findings are supported by substantial evidence or whether there has been an error of law or a constitutional violation. *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 561, 493 A.2d 653 (1985). Where the findings are supported, this Court may not make an independent judgment or indulge in the process of weighing evidence. *Lancaster Yellow Cab & Baggage, Inc. v. Pennsylvania Public Utility Commission*, 61 Pa. Cmwlth. 160, 432 A.2d 1143 (1981).

application would be in jeopardy. The applicant, however, was a corporation, and the ALJ noted the strong presumption in Pennsylvania against piercing the corporate veil and disregarding the separate legal entity of the corporation, citing *Wedner Unemployment Compensation Case*, 449 Pa. 460, 296 A.2d 792 (1972). In *Kaites v. Department of Environmental Resources*, 108 Pa. Cmwlth. 267, 529 A.2d 1148 (1987), the Court noted the general rule in Pennsylvania that a corporation shall be regarded as an independent entity even if, as in that case, its stock is owned entirely by one person. The Court listed use of the corporate form to perpetuate a fraud as one of the factors for disregarding the independent entity. The Supreme Court recently reaffirmed these principles in *Lumax Industries, Inc. v. Aultman*, —— Pa. ——, 669 A.2d 893 (1995). In *Sweeney v. Department of Transportation*, 120 Pa.Cmwlth. 591, 549 A.2d 1001 (1988), the Court stated that there must be evidence of some activity or plan that vitiates the corporate purpose.

In the present case, the ALJ found that Harry Williams, President and Chief Executive Officer of UJSP, worked for Owl Cab Company from 1946, when the company began operations, until it was dissolved in the 1960's; from 1957 onward he was supervisor and manager. In that capacity he hired and fired employees, supervised drivers, filled out accident reports and conducted safety meetings. Williams currently operates a Commission-certificated moving company, whose building and parking area will in part be used for UJSP cabs. Williams will be in charge of UJSP operations, performing similar functions including insuring that UJSP operates according to Commission requirements. Initial Decision, Finding of Fact No. 17. The ALJ determined that the record demonstrated that UJSP will operate safely and legally. The Court finds substantial evidence to support the ALJ's findings concerning the management of operations.

As for McCoy's past infractions, the ALJ concluded that the record showed that the corporation was created to obtain necessary financing, not that McCoy formed it to hide behind or to perpetrate a fraud. The Court

observes that, under *Wedner, Kaites* and *Sweeney*, Yellow Cab's allegations, even if accepted as true, are not sufficient to justify disregarding the independent entity of the corporate applicant in this proceeding. Therefore, Yellow Cab's citation to cases such as *Brinks, Inc. v. Pennsylvania Public Utility Commission*, 500 Pa. 387, 456 A.2d 1342 (1983), and *Bunting Bristol Transfer, Inc. v. Pennsylvania Public Utility Commission*, 418 Pa. 286, 210 A.2d 281 (1965), where there was no question concerning the attribution of the illegal conduct to the applicant, is simply inapposite. Consequently, the Commission did not err in concluding that this record does not show that the applicant, UJSP, lacks a propensity to operate safely and legally.

## II.

■ Yellow Cab next asserts that UJSP failed to demonstrate need for the proposed service, or, in the alternative, that it failed to demonstrate need throughout the area for which authority was requested.[5] The Commission has held that a public demand or need for an applicant's proposed service must be proved through witnesses comprising a representative sampling of the public that will use the service; such witnesses must be legally competent and credible; their testimony must be probative and relevant to the application, and they must articulate a demand/need for the type of service embodied in the application. *Re Blue Bird Coach Lines, Inc.*, 72 Pa.P.U.C. 262 (1990). An applicant is not required to show demand for its service at every point in the proposed territory; it is sufficient to show that need exists within the area generally served. *Morgan Drive Away, Inc. v. Pennsylvania Public Utility Commission*, 99 Pa.Cmwlth. 420, 512 A.2d 1359 (1986).

Yellow Cab repeats assertions made to the ALJ and the Commission that many of UJSP's witnesses were not competent to give testimony on the question of need. For example, Yellow Cab refers to the testimony of Barbara Robinson to the effect that she had attempted to call a cab only once or twice in a year and a half and the testimony of William Foster that he had not attempted to use

cab service since 1980. Robinson had been told more than once that Yellow Cab does not go into the Glenwood section of Pittsburgh, and when she took a cab from downtown the driver stopped a mile from her home and told her he would take her no farther. Initial Decision, Finding of Fact No. 1. Foster uses jitneys rather than cabs because cabs would not stop for his hail when he was downtown. *Id.,* Finding of Fact No. 4. Another witness, dressed in a business suit in downtown Pittsburgh, had to walk several blocks to a hotel for cab service because his repeated hails for a cab were ignored; one taxi driver who ignored the witness' hail drove two blocks and picked up another passenger. The testimony of a large number of other witnesses concerned similar or even more egregious conduct by Yellow Cab.

The ALJ commented with reference to the testimony of Robinson that, considering her experience with Yellow Cab, her not calling for cab service does not discredit her testimony as to need but rather supports it. That comment applies to much of the other need testimony as well. On the basis of overwhelming evidence, the ALJ expressly stated: "It is apparent from this record that Yellow Cab does not serve all of its service territory." *Id.,* p. 33. He noted that all of the need witnesses were African–Americans and questioned whether Yellow Cab, in fact, provides equal service in its service territory. Yellow Cab's argument that lack of need is shown because it received relatively few calls for service from communities and members of the public whom it refused to serve goes beyond being merely unpersuasive.

Concerning the geographic scope of the authority granted, Yellow Cab asserts that the majority of the need witnesses were from the Hill District and Homewood sections of the City of Pittsburgh, and it contends that any authority granted to UJSP should be limited to those sections. The ALJ noted that the need witnesses reside in Glenwood, the Northside, Garfield, Homewood, Wilkinsburg, North Point Breeze, the Hill District and Wilkins Township and noted further that the relevant consideration is not their residences but rather the areas to and from which they need service. In addition to service from their residences the witnesses testified to need for cab service for medical reasons, to and from downtown Pittsburgh, to and from the bus station, from Squirrel Hill, from Magee Women's Hospital in Oakland and to and from all sections of Pittsburgh. The Court's review of the record shows more than substantial evidence to support a finding of demand and need in the area to be served generally, beyond the restricted area that Yellow Cab would have the Court approve.[3]

### III.

■ As to its challenge to technical and financial fitness of UJSP to perform the requested service, Yellow Cab cites the standard articulated by the Commission in *Re Perry Hassman,* 55 Pa.P.U.C. 661 (1982): the applicant must have sufficient technical and operating knowledge, staff and facilities to provide the proposed service and sufficient financial ability to provide reliable and safe service. On the issue of technical fitness the ALJ noted the evidence that UJSP has available to it for lease four or five vehicles that meet the requirements of 52 Pa.Code § 29.314(a) for seating capacity for call and demand service. The ALJ further noted the expertise of Brian VanDusen, a member of the corporation, in the advertising and pro-

3. Yellow Cab also argues at length that its evidence showed a significant decline in population in the City of Pittsburgh and a decline in the use of both its and Peoples Cab Company's cab services due to that and other factors, including the availability of subsidized transportation programs such as Access. Yellow Cab asserts that, because of the economic benefit to it of putting as many leased cabs on the road as possible, "it only follows that if there were additional need or demand for service, Yellow Cab would be happy to meet it." Brief of Yellow Cab at 27. Although

Yellow Cab persistently discounts any link between its illegal practices and the need for additional service, the ALJ and the Commission determined, based upon the record, that the degree of illegal jitney service in Pittsburgh is necessarily linked to the refusal of Yellow Cab to perform all of the service for which it has sought and received authority. In these circumstances, trends up or down in the demand for service that Yellow Cab chooses to perform are irrelevant to the type of need that UJSP sought to establish.

motion field in which he will work; the expertise of Yvette Gilbert, Treasurer of UJSP, in the area of managing financial matters, where she will function; the experience and expertise of UJSP's President Williams, noted above; and McCoy's experience driving cabs and his degrees relating to electronics technology. The ALJ noted as well the lack of a requirement in the regulations that UJSP show the means it will use to dispatch cabs, which McCoy declined to reveal.

As to financial fitness, the ALJ noted the availability of vehicles, UJSP's filing of a loan application for $5,000, which would be approved upon receipt of Commission authority and other loan applications. UJSP planned to purchase fare meters and a communication system from loan proceeds and has leased sufficient office and operations space. Despite Yellow Cab's negative characterization of the testimony and exhibits, the Court concludes that substantial evidence supports the Commission's findings and conclusions in regard to technical and financial fitness.

Yellow Cab also asserts that the ALJ abused his discretion in declining to give any weight to Yellow Cab's Exhibit No. 2, which summarizes by neighborhood its calls for service from economically depressed areas over a period from October 22 to November 14, 1993 and that the calls received responses. This period was before the first hearing in this case but after the filing of the original application and its publication. Assuming for the sake of argument that this exhibit falls outside the prohibition on admission of self-serving declarations prepared in anticipation of litigation,[4] Yellow Cab advances no reason why the ALJ was required, as a matter of law, to conclude that evidence of adequate service over a six-week period should outweigh evidence of inadequate service over a period of more than twenty years.

Yellow Cab objects to the ALJ's characterization as hearsay of the testimony of James Campolongo, Chief Executive Officer of Yellow Cab, regarding concerns of his drivers relating to securing sufficient fares and to dangers in certain parts of the city. The ALJ stated that the drivers themselves were best qualified to testify as to their concerns. Although Campolongo could testify with first-hand knowledge as to statements that he personally heard, the statements made outside the hearing, when offered to prove the truth of the matters asserted, meet the classic definition of hearsay. *See Feinberg v. Unemployment Compensation Board of Review,* 160 Pa.Cmwlth. 524, 635 A.2d 682 (1993), *appeal denied,* 539 Pa. 670, 652 A.2d 840 (1994).

Contrary to Yellow Cab's assertion, the ALJ did not reject all of Campolongo's evidence for lack of expertise in demographics and economics; the ALJ found declining population in accordance with Yellow Cab's Exhibit No. 1 and made findings regarding decreased numbers of calls for cabs. The ALJ did reject Campolongo's speculation, and properly so, that people in areas enumerated in Exhibit No. 2 "a lot of times ... can't afford taxi service of any sort" and that "some of these people just don't travel into the City from certain areas." N.T., p. 281. The Court finds no abuse of discretion in the ALJ's conclusion.[5] Accordingly, the order of the Commission is affirmed.

### ORDER

AND NOW, this 21st day of March, 1996, the order of the Pennsylvania Public Utility Commission is affirmed.

---

4. *See, e.g., Ulansey v. Juniata Park Medical Center, Inc.,* 406 Pa. 389, 178 A.2d 547 (1962).

5. Yellow Cab contends that the ALJ erred in not requiring UJSP to republish its application in the Pennsylvania Bulletin after the name of the applicant was changed from McCoy to UJSP. The ALJ concluded that the same service rights were requested, with only the name of the applicant changed, and no member of the public would be prejudiced by the lack of republication. Yellow Cab was the sole protestant to the initial application. The Court observes further that in raising this argument, Yellow Cab is asserting the rights of others, as to which it lacks standing. The Court sees no error in the Commission's ruling on this point.